UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,       Case No. 1:20-cv-502

  v.

             Hon. Robert J. Jonker
DARRELL JONES, FATIMA JONES, and Chief U.S. District Court Judge
JONES INVESTING, LLC,

    Defendants.

_____/

### UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 72)

On June 6, 2020, the United States filed an action alleging that Defendants, through the actions of Defendant Darrell Jones ("Jones"), subjected female tenants living in the rental properties owned and managed by Defendants to severe and pervasive sexual harassment in violation of the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* ("FHA").  During discovery, eleven of Defendants' current or former tenants testified about the harassment to which Jones subjected them, s*ee supra* at Sec.(I)(B), which in some cases culminated in their being forced to leave because Defendant Jones filed eviction proceedings against them or refused to renew their lease, *supra* at Sec.(I)(B)(1), (2), (5), and (6).  Defendants acknowledge that sexual conduct or statements between Defendant Jones and his tenants occurred, but claim that it was initiated by the tenants.  *See supra* at Sec.(I)(A).

Defendants seek summary judgment, claiming that the United States is powerless to seek redress for Jones' actions for two reasons, both of which lack merit.  First, Defendants argue that the United States' suit is time-barred to the extent it seeks damages for sexual harassment that occurred more than two years ago.  (Def. Br., ECF No. 76 at PageID.457-461.)  The two-year

statute of limitations Defendants cite, however, only applies to private lawsuits brought under 42 U.S.C. § 3613.  The United States' claims for injunctive relief, monetary damages, and civil penalties are brought under 42 U.S.C. §3614(a), and are all timely within the applicable statute of limitations for lawsuits initiated by the Department of Justice under this provision.

Second, Defendants argue that, even accepting the truth of the tenants' testimony, the sexual conduct and statements to which Jones subjected them were not egregious enough to constitute a violation of the law.  (Def. Br., ECF No. 76 at PageID.461-5.)  The record, however, is replete with evidence that a jury could find establishes that Defendant Jones' conduct was sufficiently severe and pervasive to create a hostile housing environment, and in some cases also amounted to *quid pro quo* harassment, both of which violate the FHA.  Although Defendants emphasize that they rent to residents with "bad credit" who live in "bad areas," *supra* at 3, the law does not force women to endure sexual harassment just because their housing options are limited.  Therefore, the Court should deny Defendants' motion for summary judgment.

## I.      STATEMENT OF FACTS

### A.      DEFENDANTS' OWNERSHIP AND MANAGEMENT OF RENTAL PROPERTIES THROUGHOUT MUSKEGON, MICHIGAN

Defendants own and manage more than thirty rental properties throughout Muskegon County, Michigan and have been engaged in the real estate business since at least 2006.  (Ex. A, Finances and Assets, JONES001087-89; Ex. B, F. Jones Dep. 18:22-25.)  These residential rental properties consist primarily of single-family homes and several multi-unit buildings.  (Ex. C, Def. Darrell Jones' Answers to Interrog., Resp. to Interrog. 2.)

Defendant Jones and his wife, Defendant Fatima Jones ("Fatima"), started Jones Investing, LLC for the purpose of purchasing cheap homes, often in foreclosure sales, and remodeling them.  (Ex. B, F. Jones Dep. 49:1-49:6; Ex. D, D. Jones Dep. 273:8-274:4.)  Soon

after starting their business, they decided to keep some of the properties so they could offer them for rent.  (Ex. B, F. Jones Dep. 18:8-12.)  Defendants hire whomever offers to do the work for the lowest price to help with remodeling the homes and, according to Defendant Jones, "[t]he cheaper the better."  (Ex. D, D. Jones Dep. 274:10-22.)   Defendants generally rent to people who have "bad credit," charging them a $75 application fee, which Defendant Jones believes is the maximum amount he can charge.   (*Id.* at 277:22-278:12.)  Defendant Jones feels they own the "best houses" that are located in "bad areas."  (*Id.* at 277:22-278:12; 79:3-10.)

Defendant Jones participates in all aspects of the daily management of the properties for the benefit of himself, Defendants Fatima and Jones Investing, including showing the properties to prospective tenants, accepting and approving tenant applications, collecting rent, handling maintenance requests, initiating evictions, and communicating with tenants regarding late payments.  (*Id.* at 42:2-43:21, 53:23-54:19.)  Defendant Fatima, who co-owns many of the properties along with Defendants Jones Investing and Jones, reviews rental applications, performs credit checks, and recommends to Defendant Jones whether a prospective tenant should be offered a lease.  (*Id.* at 42:2-14.)  She also does the bookkeeping, the initial communication with prospective tenants in response to advertisements, and drafting leases.  (Ex. B, F. Jones Dep. 51:1-15.)

**B.    DEFENDANTS' SEXUAL HARASSMENT**

On May 31, 2018, the United States received an email from the Fair Housing Center of Western Michigan notifying the government of a potential FHA violation by Defendant Jones, who was accused of sexual harassment by one of his former tenants.  (*See* Ex. E, Email from Fair Housing Center of West Michigan, dated May 31, 2018, US0000004-5.)

After conducting an investigation, the United States filed suit against Defendants on June

3

6, 2020.  During discovery, eleven current or former tenants of Defendants testified about Defendant Jones' sexual harassment, much of which was carried out using a similar modus operandi.  Defendant Jones acknowledged that "inappropriate stuff, sexual stuff" happens "a lot" in his business, but claimed it was generally initiated by the resident.  (Ex. D, D. Jones Dep. 260:8-261:7.)  He stated:  "Listen to this.  I'm telling you . . . I done seen a lot of stuff. . . .  I pull up at the curb, they got their – they standing at the door with their titties out.  You know what I'm saying?  I done seen all kinds of stuff."  He further explained that "a lot of these women" try to flirt or offer sex to stay in the homes rent-free.  (*Id.* at 155:21-156:10.)  According to Defendant Jones, female tenants have tried to pull his clothes off (*id.* at 258:19-259:6), and often show him their breasts when he comes to the door to collect the rent.  (Ex. D, D. Jones Dep. 262:20-263:3.)  He claimed that at least one tenant has shown him her vagina, but there could be more because, as Defendant Jones stated, "I don't know for exact. . . . I don't keep count. . . . I can tell you that people did."  (*Id.* at 260:11-13.)

The testimony of the eleven tenants is described in more detail below.

**1.      Defendant Jones' Sexual Harassment of Ms. Williams**

Ms. Williams rented 3314 Lemuel Street from Defendants from May 2015 until September 2017.  (Ex. F, Williams Dep. 27:19-28:2.)  Defendant Jones sexually harassed Ms. Williams throughout her tenancy, subjecting her to unwelcome sexual comments virtually every time he saw her.  As she stated, "He always had something to say [about her body], every time . . . [h]e always made comments."  (*Id.* at 33:6-11.)  In particular, Defendant Jones used their regular meetings when she paid the rent to sexually harass her.  When Ms. Williams paid her rent, Defendant Jones would meet her in his car, instruct her to get into the passenger seat, power off her cell phone, and show him that she complied.  (*Id.* at 33:1-5.)  Defendant Jones would

4

often then comment on Ms. Williams' body, saying things like, "Get out.  Turn around.  Let me see that ass."  (*Id.*)  On more than one occasion, Defendant Jones touched her "intimately" on her thigh during these meetings.  (*Id.* at 33:19-20, 34:5-8.)  Defendant Jones also frequently drove by her house or parked outside her home (*id.* at 35-18-20), called her frequently (*id.* at 47:5-12), and constantly asked her about her sex life and whether she had sex with other men (*id.* at 66:2-12).

Ms. Williams was "tormented" by Defendant Jones' unwelcome conduct.  (*Id.* at 47:11-12.), but she continued to talk to him and meet him because she knew that "[Jones] could put [her] out at any time." (*Id.* at 47:5-12).  Ms. Williams "had friends that tried to help protect" her. (*Id.* at 28:14-17, 29:1-3.)  For instance, one male friend allowed Ms. Williams to park his car at her apartment in an effort to deter Defendant Jones from dropping by her house.  (*Id.* at 29:4-9, 30:18-31:10.)  Eventually, Defendant Jones' advances increased in such frequency that she told him that "he couldn't keep calling [her]" and grew bolder in her denials.  (*Id.* at 68:10-13).  In response, Defendant Jones declined to renew Ms. Williams' lease and filed suit to obtain possession.[1]  ( *Id.* at 71:14-18.)

## 2.     Defendant Jones' Sexual Harassment of Ms. Coleman

Ms. Coleman lived at 1875 Dyson Street in 2016 with her boyfriend and their young daughter.  (Ex. G, Coleman Dep. 8:8-20.)  Ms. Coleman testified that "[e]very time" she paid rent each month, Defendant Jones made sexually explicit comments, tried to hug her, looked at her breasts, asked her on dates, asked her on trips, asked why she was with her boyfriend, offered to move her to a nicer house, and touched her breasts without consent.  (*Id.* at 28:21-25, 31:10-

---

[1]  Defendants falsely state that Ms. Williams was evicted for nonpayment of rent. (ECF No. 76, Page ID.456).  Ms. Williams' Notice to Quit cites the reason for eviction as "end of lease/no renewal" (ECF No. 76-19, Page ID.609) and the court issued a consent judgment for the landlord's right to recover possession, rather than nonpayment of rent.  (*Id.* at Page ID.610).

20.)  On another occasion, when she told Defendant Jones that she was going to have to repair her door, he told her that he would take care of it if she showed him her breasts.  (*Id.* at 28:13-17.)  Defendant Jones often offered Ms. Coleman money but, on the one occasion that Ms. Coleman asked for more information about this offer, Defendant Jones told her that she would "have to do something before then" and discussed taking her on a trip.  (*Id*. at 37:2-10.)  Ms. Coleman declined, but Defendant Jones later called and asked her to send a nude photo of herself.  (*Id*.)  Defendant Jones's conduct made Ms. Coleman "feel very uncomfortable," but she continued to stay in her apartment because she needed a place to live.  (*Id.* at 27:17-24, 31:13-15.)

Defendant Jones called her frequently and "kept showing up," uninvited and without notice, sometimes knocking on her door after 11:00 p.m. on evenings when Ms. Coleman was alone.  (*Id.* at 33:15-20, 37:21-39:11.)  On the last such occasion, Ms. Coleman was so "scared," that she told Defendant Jones that she had company to deter him from coming inside.  (*Id*. at 38:3-9.)  Ms. Coleman later posted on Facebook describing Defendant Jones' conduct and stated that she "[didn't] feel safe in [her] own home."  (*Id.* at 39:24-40:12; Ex. H, Facebook Post, Def. Supp. Prod. of Doc. on Aug. 30, 2021, p. 122.)  Defendant Jones testified that he evicted Ms. Coleman because she made inappropriate sexual comments toward him, although he could not recall a single comment.  (Ex. D, D. Jones Dep. at 160:22-24; 168:10-169:15.)  Ultimately, Ms. Coleman left before her lease term ended due to Defendant Jones' harassment.  (Ex. G, Coleman Dep. 43:24-44:3.)

### 3.     Defendant Jones' Sexual Harassment of Ms. Crews

Ms. Crews rented 2179 Continental Street for about a year between 2008 and 2009.  (Ex. I, Crews Dep. 19:18-22.)  From the first time Defendant Jones collected rent, his unwelcome

conduct towards her included commenting on her appearance and the size of her breasts, offering to buy her gifts including a new car, talking about his penis and the ways he could please her, and saying he could satisfy her better than her boyfriend. (*Id.* at 23:4-18; 25:23-26:24; 34:1-9; 35:9-36:14.) He often lingered at her home for close to an hour, trying to engage her in conversation and making inappropriate comments. (*Id.* at 23:4-24:12.) On one such occasion, while he was talking about her body and the size of her breasts, Defendant Jones grazed one of her breasts with his pinky ring. (*Id.* at 24:6-26:24.) After the harassment became more frequent, Ms. Crews arranged for other people to be around as much as possible when Defendant Jones came by to collect the rent. (*Id.* at 22:3-18, 25:4-8.)

Defendant Jones frequently showed up at her house unannounced and invited, sometimes using his keys to enter her home without notice. (*Id.* at 23:4-18, 24:4-12, 36:16-20) (testifying that he was there "[e]very time" she turned around).) Defendant Jones also called her at all times of the day, "whenever he felt like it." (*Id.* at 37:17-38:4.) Ms. Crews felt compelled to answer when he called because she feared that if she did not, he would stop by the house, or worse, "throw her out." (*Id.* at 39:18-40:1.)

The final straw was when Ms. Crews was two weeks late on paying her rent. Defendant Jones told her he would forgive or reduce her late rent in exchange for sex. (*Id.* at 56:6-58:14.) Ms. Crews declined, and instead borrowed from her 401(k) to pay rent. (*Id.*) Ms. Crews moved out a couple months later. (*Id.*)

### 4. Defendant Jones' Sexual Harassment of Ms. Haynes

Ms. Haynes rented 1094 Sanford Street from Defendants for approximately nine years. (Ex. J, Haynes Dep 5:15-18.) In the beginning, Defendant Jones typically collected rent from Ms. Haynes by parking outside her house and having her come out to his truck. (*Id.* at 65:16-

67:1.)  After Ms. Haynes handed him the rent, Defendant Jones would comment on her body while she was walking away.  (*Id.* at 66:22-67:1.)  Defendant Jones' made Ms. Haynes feel so uncomfortable that as a result, in 2019 or 2020, Ms. Haynes arranged to pay Defendant Jones at locations other than her home.  (*Id.* at 65:16-21.)

Nevertheless, Defendant Jones continued to comment on Ms. Haynes appearance, telling her how "fine" she was, how pretty her lips were, and how good she looked.  (*Id.* at 33:1-2.)  Ms. Haynes does not recall the exact number of times Defendant Jones made these comments, but recalls that it happened "quite often."  (*Id.* at 33:8-15.)  The last comment she can recall was in March of 2020 when Defendant Jones met her at Fifth Third Bank to collect rent.  (*Id.* at 33:16-22.)  When she met him, he begged her to let him "take care of her" and told her, if she did, she would not have to pay rent anymore.  (*Id.* at 33:24-34:1.)  Defendant Jones also often drove past her house and frequently stopped by unannounced.  (*Id.* at 63:8-12, 64:23-65:2.)

Defendant Jones tried to get physical with Ms. Haynes on a number of occasions, including attempting to hug her, hold her hand, or kiss her.  (*Id.* at 32:11-23.)  Ms. Haynes was "fearful" of Defendant Jones' "touching" and "grabbing," and tried to minimize her contact with him because she was "tired of the advances."  (*Id.* at 43:10-15, 51:1-5.)  Defendants initiated an eviction action against Ms. Haynes, which was pending at the time of her deposition, but had been stayed due to the eviction moratorium.  (*Id.* at 58:24-59:23.)  Ms. Haynes plans to move out, but her health issues have prevented her from getting out and finding a new home.  (*Id.*)

## 5. <u>Defendant Jones' Sexual Harassment of Ms. Marble</u>

Ms. Marble rented 943 E. Isabella Street in 2016.  (Ex. K, Marble and Jones Lease Agreement, JONES000531-537.)  Defendant Jones typically collected rent from Ms. Marble by parking outside her house and having her come to his car.  (Ex. L, Marble Dep. 24:19-21.)

Beginning on the second time Defendant Jones came to collect rent, when Ms. Marble came to his car, he looked down at her breasts, and asked her if he could take her on a trip or out to eat. (*Id.* at 24:25-25:25.)  This made her uncomfortable, so the next time Defendant Jones came to collect rent, she made an audio recording.  (*Id.*)  During that encounter, Defendant Jones tried to put his hand down her shirt to touch her breast, and told her he would reduce her rent for next month if she would "get with" him.  (*Id.*)  Defendant Jones stopped when he realized she was recording.  (*Id.*)  On yet another occasion when she was paying her rent, Defendant Jones grabbed her buttocks as she was walking away.  (*Id.* at 35:20-36:9.)

Defendant Jones called Ms. Marble at inappropriate times, including late at night, to ask what she was doing.  (*Id.* at 26:5-17.)  He contacted her so often that he got frustrated when she would "not cooperate." (*Id.* at 26:22-27:3.)  One time, Defendant Jones texted her late at night and asked her to send him photos of her breasts and vagina.  (*Id.* at 27:4-10.)  On another occasion, he sent her a nude photo of his "private part."  (*Id.* at 28:19-21.)  Ms. Marble told Defendant Jones that his behavior made her "uncomfortable" and that his actions were "inappropriate," and he responded that he just really liked her.  (*Id.* at 27:11-28:7.)  Ms. Crews felt so uncomfortable that she could not sleep at night.  (*Id.*)

Defendant Jones initiated eviction proceedings against Ms. Marble even though she had paid her rent.  (*Id.* at 32:8-13.)  Ms. Marble moved out of the apartment voluntarily before the date the judge ordered her to turnover possession. (*Id*. at 34:2-7.)

### 6.  Defendant Jones' Sexual Harassment of Ms. Moore

Ms. Moore entered into a lease agreement with Defendant Jones for the property located at 1095 Fleming starting in January 2018.  (Ex. M, Moore Dep. 8:23-25.)  Defendant Jones typically collected rent from Ms. Moore by parking by the curb outside her house and having her

come to his car.  (*Id.* at 23:10-14.)  On one such occasion, a few weeks after Ms. Moore moved

in, he asked her to get in his car and power off her cell phone.  (*Id.* at 24:3-25:11.)  When she

asked him why, he told her "this information [is] confidential and he didn't want it to get out."

(*Id.*)   Once Ms. Moore turned off her phone, Defendant Jones told her that he could "clear [her]

credit" of her outstanding student loans and other items he had seen on her credit check.  (*Id.* at

24:25-25:10.)  He also offered to buy her a car and told her she could make payments to him to

pay it off.  (*Id.* at 24:5-25:11.)  Ms. Moore declined his offer, and as she got ready to get out of

the car, Defendant Jones touched her buttocks.  (*Id.* at 25:9-11.)   In response, Ms. Moore

slapped his hand and told him that was not appropriate.  (*Id.* at 25:14-15, 26:20-24.)

Defendant Jones started calling Ms. Moore "a few times a week" about helping her

improve her credit, get a car, and "just to talk."  (*Id.* at 11:19-12:3.)  The calls would occur at all

hours of the day and there were times when he would call her two times a day.  (*Id.* at 12:4-9,

20:25-21:4.)

On or around Ms. Moore's birthday in late February 2018, Defendant Jones called her

while she was shopping at the Muskegon mall and asked her what she was doing.  (*Id.* at 31:14-

23, 35:15-25.)  Ms. Moore replied that she was at the mall in Younkers department store.  (*Id.* at

31:24-32:4, 33:21-23.)  Shortly thereafter, Defendant Jones showed up at Younkers and gave

Ms. Moore $200 for her birthday, which she accepted.  (*Id.* at 32:1-7.)

After leaving the mall, Ms. Moore went to Olive Garden.  (*Id.* at 32:7-9.)  Ms. Moore and

Defendant Jones did not have plans to meet up there, but she saw him sitting at the bar when she

arrived.  (*Id.* at 32:7-16.)  Ms. Moore had dinner and a drink, and when she got up to leave, she

learned that her tab had already been paid.  (*Id.* at 32:7-16.)  When Ms. Moore left, Defendant

Jones followed her outside to her car.  (*Id.* at 32:17-18, 36:22-24.)  While in the parking lot,

Defendant Jones told Ms. Moore: "You should just fuck with a real nigger," "if you just F with me, then you'll understand," if she "got on his team" then she "was going to be okay," and he "wanted to perform oral [sex] on her." (*Id.* at 32:17-33:9, 37:7-12.)  Ms. Moore reminded Defendant Jones that he was her landlord and told him she was not "here for those type of services, or whatever it is [he was] trying to get from [her]." (*Id.* at 33:6-16.)

Defendant Jones initiated eviction proceedings against Ms. Moore several weeks later alleging, falsely, that she had an unauthorized pet living on the property. (*Id.* at 19:6-20:2, 37:13-15.)  As the allegation that she had an authorized pet was false,[2] Ms. Moore concluded that she was evicted because she was not responding to Defendant Jones' sexual advances. (*Id.* at 40:7-41:7.)  Ms. Moore agreed to move out voluntarily. (*Id.* at 19:21-20:12.)

### 7. Defendant Jones' Sexual Harassment of Ms. Randle

Ms. Randle lived at 2179 Continental Avenue from the fall of 2010 until April 2011. (Ex. N, Randle Jones Lease Agreement, JONES000335-9.)   Defendant Jones collected rent from Ms. Randle in person each month, always flirting and making sexual comments when he did so. (Ex. O, Randle Dep. at 24:1-3, 35:20-36:3, 38:8-39:16.)  For example, Defendant Jones told Ms. Randle: "you need to stop playing and you need to come on," which she understood to mean that he wanted her to have a sexual relationship with him. (*Id.* at 38:18-39:16.)  Defendant Jones also made unwelcome comments focused on Ms. Randle's appearance, particularly her breasts. (*Id.* at 59:5-12.)

Towards the middle of her tenancy, Ms. Randle went to Home Depot with Defendant Jones to select new siding for a home she wanted to purchase from him. (*Id.* at 32:4-14, 37:22-

---

[2]  Defendant Jones approved Ms. Coleman's request to have the dogs and never indicated during her tenancy that the dogs had become a problem. (Coleman Dep. 57:22-25.)

38:2.)  They left Home Depot together and stopped at a Mexican restaurant for dinner.  (*Id.* at 46:18-21.)  After leaving the restaurant, Defendant Jones drove Ms. Randle to the carpool area near the airport.  (*Id.* at 32:15-19.)  He parked his van and asked Ms. Randle to move to the back seat to talk.  (*Id.* at 32:20-33:1.)  When she got in the back seat, Defendant Jones touched her around her waist, asked her to come closer, and told her that if she would have sex with him, things would be financially easier for her.  (*Id.* at 33:2-9, 36:8-14, 37:1-5, 38:25-39:3.)  Ms. Randle told him she wanted to leave because his behavior was not professional.  (*Id.* at 33:10-18.)  Instead of taking her home, Defendant Jones told her he wanted to take her somewhere, but she needed to put on a blindfold first.  (*Id.* at 34:2-7.)  Ms. Randle agreed, and when she took the blindfold off, they were in a nice neighborhood with large homes.  (*Id.* at 34:12-35:1.)  Defendant Jones told her that this was the kind of life she could have if she was with him.  (*Id.*)  Defendant Jones later filed an eviction action against Ms. Randle, but she had already moved out.  (*Id.* at 45:12-46:1.)

## 8.   Defendant Jones' Sexual Harassment of Ms. Shepherd

Ms. Shepherd lived at 1960 Clinton Street from March 2019 through July 2019.  (Shepherd Dep., Ex. P, at 8:12-17, 12:22-25, 34:18-19.)  Ms. Shepherd had been living in a shelter and struggling to find housing when she found Defendant Jones' advertisement on Craigslist.  (*Id.* at 11:21-12:9, 13:5-6, 13:19-23.)  Defendant Jones began making unwelcome sexual comments to Ms. Shepherd once she moved in.  (*Id.* 30:15-18.)  Once, when Defendant Jones was at her apartment to address a maintenance issue, while sitting on the couch, Defendant Jones sat down next to her touched her inner thigh.  (*Id.* at 25:3-7, 30:20-32:3.)  Ms. Shepherd "got upset" and "asked him to leave," and Defendant Jones apologized and moved his hand to her lower back.  (*Id.* at 30:22-32:3.)  Defendant Jones did not leave her house until he saw her

12

child's father pull up.  (*Id.* at 38:18-39:4.)

Ms. Shepherd stayed at Defendant Jones' property out of necessity.  (*Id.* at 39:16-40:20.)
She testified that she told Defendant Jones that she wanted to leave, but he responded that she
would have to pay rent until a new tenant rented the unit.  (*Id.*)  Ms. Shepherd decided to "just
deal with it for a year and then just move out."  (*Id.* at 38:20-23.)  But, after Ms. Shepherd made
it "crystal clear" to Defendant Jones that she "wanted nothing to do with him as far as any
[romantic] relationship," Defendant Jones filed for eviction proceedings within five days of Ms.
Shepherd's late June payment.  (*Id.* at 38:12-16; 34:20-35:25.)

### 9.    Defendant Jones' Sexual Harassment of Ms. Brown(1)

Ms. Brown(1) lived at 2179 Continental Street from April 2015 to March 2017.  (Ex. Q,
Brown(1) Jones Lease Agreement, JONES004150-57)  A couple of months after she moved in,
Defendant Jones began making unwelcome sexual comments to her when he came to collect rent
from her at her house.  (Ex. R, Te. Brown Dep. at 26:14-19.)  Defendant Jones said things like
"I've always wanted you" and "I've always wanted to date you."  (*Id.* at 25:5-13.)  He also made
comments about her body such as:  "Your butt is so big," and "I would like to get in that."  (*Id.* at
27:15.)  Defendant Jones offered to buy Ms. Brown(1) a car, pay off her student loans, and take
her on trips, because he was a "multi-millionare."  (*Id.* at 41:25-42:17.)  On a number of occasions,
Defendant Jones told Ms. Brown(1) that he would give her a discount on her rent if she would go
to Grand Rapids or on a date with him.  (*Id.* at 55:7-17.)

Defendant Jones' behavior made Ms. Brown(1) feel "very uncomfortable" because she did
not know when he would "just pop up."  (*Id.* at 56:10-23.)  Ms. Brown said that she did not feel
safe because she did not know what else Defendant Jones was capable of doing.  (*Id.*)

### 10.      Defendant Jones' Sexual Harassment of Ms. Brown(2)

Ms. Brown(2) entered a land contract with Defendant Jones for a property located at 1316 Allen Avenue in June 2011.  (Ex. S, Brown(2) Jones Land Contract (portion), JONES001635-44.)  Defendant Jones typically collected rent from Ms. Brown(2) in person, either at her home or somewhere else.  (Ex. T, To. Brown Dep. 22:24-23:1.)  Initially, Ms. Brown(2) met Defendant Jones alone to pay her rent.  (*Id.* at 25:20-23.)  But, when Defendant Jones began making unwelcome comments to Ms. Brown(2), she felt so uncomfortable that she started having her boyfriend or son accompany her to "feel protected."  (*Id.* at 26:3-17.)

The first unwelcome sexual comment occurred about a year into Ms. Brown(2)'s tenancy.  (*Id.* at 26:18-20.)  When Ms. Brown (2) went out to Defendant Jones' car to pay rent, he asked her out on a date.  (*Id.* at 26:21-27:11.)  When she turned him down, he wanted to know why since he "looked good," "smelled good," and was a "multimillionaire."  (*Id.*)  The second time, Defendant Jones asked her on a date, she replied "[D]on't you have a wife?"  (*Id.* at 27:19-24.)  In response, he told her:  "I just love women."  (*Id.*)  He also asked her why she did not answer when she called earlier because he had bought her roses and candy.  (*Id.* at 29:2-30:2.)  The third time, Ms. Brown(2) met Defendant Jones at a pizza place to pay her rent.  (*Id.* at 28:8-15.)  On this occasion, Defendant Jones told Ms. Brown(2) that her jeans looked good on her and made comments about her appearance.  (*Id.*)

Ms. Brown(2) transferred her interest in the property back to Defendants and moved out.  (*Id.* at 35:21-36:12.)

### 11.      Defendant Jones' Sexual Harassment of Ms. Henderson

Ms. Henderson lived at 1507 Park Street from May 2008 through June 2009.  (Ex. U,

Henderson Jones Lease Agreement, JONES0004167-72.)  Defendant Jones made unwelcome comments about Ms. Henderson's body almost every time he collected the rent.  (Ex. V, Henderson Dep. at 21:11-24; 29:4-11.)  On one occasion, Defendant Jones' unwelcome comments included saying:  [Y]our ass is so fat. . . . I – just want to touch it . . . Just give me one night with you. . . . I'll show you what a real man is like."  (*Id.* at 30:14-31:25.)  Defendant Jones drove by her house at inappropriate times on various occasions.  (*Id.* at 39:25-40:23.)  Once, Defendant Jones threatened to terminate her lease or increase rent if he found her boyfriend living there.  (*Id*. at 40:18-23.)

## II.     LEGAL STANDARD AND DEFENDANTS' INITIAL BURDEN UNDER RULE 56

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Babcock & Wilcox Co. v. Cormetech, Inc.*, 848 F.3d 754, 758 (6th Cir. 2017). The moving party bears the initial burden of proving the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Only after the moving party satisfies its initial burden does the burden shift to the non-moving party to demonstrate that summary judgment is inappropriate because there exists a disputed material fact.  *Adickes v. S.H. Kress & Co.*, 389 U.S. 144, 157 (1970).  In resolving a summary judgment motion, the evidence presented by the non-moving party "is to be believed, and all justifiable inferences are to be drawn in [the non-moving party's] favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Babcock*, 848 F.3d at 758 ("The reviewing court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."). Courts "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial."  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th

Cir. 2014).  Summary judgment is appropriate only if a reasonable jury could not "return a

verdict in favor of the non-moving party."  *Babcock*, 848 F.3d at 758.

### III.    ARGUMENT

#### A.    THE UNITED STATES' CLAIM UNDER SECTION 3614(A) IS TIMELY AND VIABLE.

Defendants' argument that some of the claims in this lawsuit are time-barred relies on the

wrong statute of limitations.  Defendants incorrectly cite to 42 U.S.C. § 3613(a)(1)(A), the two-

year statute of limitations for private lawsuits brought under the FHA.  (Def. Br., ECF No. 76 at

PageID.457-458.)  This is not a private lawsuit, however.  The United States commenced this

action under Section 3614(a), which allows the Attorney General to file suit whenever he "has

reasonable cause to believe that [1] [a defendant] is engaged in a pattern or practice of resistance

to the full enjoyment of any of the rights granted by [the FHA], or [2] that any group of persons

has been denied any of the rights granted by [the FHA] and such denial raises an issue of general

public importance." 42 U.S.C. § 3614(a).  In such actions, the United States may seek, and the

court may award, appropriate injunctive relief, monetary damages (both compensatory and

punitive) for persons harmed by a defendant's discriminatory practices, and civil penalties. *See*

42 U.S.C. § 3614(d)(1)(A)-(C); *United States v. Balistrieri*, 981 F.2d 916, 934-936 (7th Cir.

1992).  Defendants  fail to distinguish between these three types of relief, all which are subject to

a different statute of limitations, and all which are timely.

#### 1.    The United States' Claims for Monetary Damages, Injunctive Relief, and Civil Penalties are Each Well Within the Applicable Statute of Limitations for Each Type of Claim.

It is well established that the United States' FHA claims for injunctive and declaratory

relief are not subject to a statute of limitations because there is no such limitation in the FHA or

other federal law.  *See United States v. Summerlin*, 310 U.S. 414, 416 (1940) ("It is well settled

that United States is not bound by state statute of limitations or subject to the defense of laches in enforcing its rights."); *United States v. Marsten Apts.*, 175 F.R.D. 257, 263 (E.D. Mich. 1997) ("The [federal] government's claims for injunctive and declaratory relief [under the FHA] are subject to no statute of limitations."); *see also United States v. Harrison*, 188 F.Supp. 2d 77, 80. (D. Mass. 2002) (holding that neither the FHA itself nor any other federal statute provides for a statute of limitations on actions for injunctive relief brought under Section 3614(a)).

Second, with respect to the timeliness of the United States' claim for monetary damages, courts have found that the Attorney General is subject to the three-year statute of limitations in 28 U.S.C. § 2415(b) for damage claims, as tolled by operation of 28 U.S.C. § 2416(c).  *See Garcia v. Brockway*, 526 F.3d 456, 460 (9th Cir. 2008) (en banc) ("Actions [under § 3614(a)] seeking damages are subject to the general three-year statute of limitations [in 28 U.S.C. § 2415(b)]"); *United States v. Tanski*, No. 1:04-cv-174, 2007 WL 1017020 *8 (N.D.N.Y Mar. 30, 2007) (same).  In its ruling that the three-year statute of limitations applies to FHA pattern-or-practice cases, the court in *Tanski* reasoned that cases brought under the Attorney General's authority "differ fundamentally" from private FHA lawsuits.  2007 WL 1017020 at * 8.  The court stated:

> A section 3614(a) claim requires reasonable cause to believe that a defendant has engaged in a pattern or practice of discrimination and permits the Attorney General to assess a civil penalty to 'vindicate the public interest.' . . .  As such, it is fully consistent with the statutory scheme of the Fair Housing Act to allow the Attorney General to recover compensatory damages on behalf of a victim of such conduct, even where the victim is time-barred from recovering compensatory damages based solely on his or her individual complaint.

*Tanski*, 2007 WL 1017020 at * 8.

Moreover, the United States' claim for damages "first accrues" under 42 U.S.C. § 2415(b) when the Attorney General's designee knew or should have known of "facts material to

the right of action," 28 U.S.C. § 2416(c), not when the individual aggrieved persons experienced discrimination. *See United States v. Town of Colorado City, Ariz.*, No. 3:12-cv-8123, 2013 WL 11826544, at *2 (D. Ariz. Jun. 6, 2013) ("[t]he critical date [] is not when the alleged pattern and practice began, but rather, the date on which [the United States] became aware of the pattern and practice.") The FHA's provisions regarding when the United States may file a civil action as compared to a private plaintiff also shed light on this difference. While the United States may file suit "[w]henever the Attorney General has reasonable cause to believe that any person . . . is engaged in a pattern or practice" of discrimination, 42 U.S.C. § 3614(a), a private plaintiff "may commence a civil action . . . not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice," 42 U.S.C. § 3613(a). The statute makes clear that any action filed by the United States stems from its "reasonable cause to believe" that a violation has occurred, and not from the violation itself. The United States first learned about potential claims against Defendant Jones on or about May 31, 2018 when it received an email from the Fair Housing Center of West Michigan regarding allegations made by one of their clients regarding Defendant Jones. (*See* Ex. E, Email from FHCWM.) Therefore, May 31, 2018 is the earliest possible date that the statute of limitations for the United States' claim for monetary damages could have been tolled. The United States filed its lawsuit against Defendants on June 6, 2020, approximately 25 months after the claim accrued, therefore it is squarely within the three-year statute of limitations for obtaining monetary damages.

Finally, an FHA claim for civil penalties under 42 U.S.C. § 3614(d)(1)(C) and 24 C.F.R § 85.3 is subject to the five-year statute of limitations set forth in 28 U.S.C. § 2462. *See Marsten Apts.*, 175 F.R.D. at 263 (28 U.S.C. § 2462 provides "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be

entertained unless commenced within five years from the date when the claim first accrued[.]");

*Harrison*, 188 F. Supp. 2d at 81.  Unlike a claim for monetary damages, however, an agency's

enforcement action for civil penalties accrues at the time of the violation.  *Trawinski v. United*

*Technologies*, 313 F.3d 1295, 1298 (11th Cir. 2002).  Multiple women testified to incidents of

sexual harassment by Defendant Jones that occurred during 2015 or later (Ms. Williams from

2015 through 2017; Ms. Coleman in 2016; Ms. Haynes for the past nine years; Ms. Marble in

2016; Ms. Moore beginning in 2018; Ms. Shepherd during 2019; and Ms. Brown(1) from 2015-

2017), all within five years of when the United States filed suit in June 2020.  *See supra* Sec.

I(C)(1), (2), (4)-(6), (8), and (9).

## 2.      The United States Has a Viable Claim Under Section 3614(a)

Aside from a conclusory assertion that "[t]here is no 'pattern' of discrimination" (Def.

Br., ECF No. 76, PageID.457-458.), Defendants do not question that the United States has a

viable claim under Section 3614(a).  Nor could they.  The Attorney General may bring an action

in federal district court whenever he "has reasonable cause to believe that" (1) "any person or

group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of

the rights granted by [the FHA] . . . ." or (2) "any group of persons has been denied any of the

rights granted by [the FHA] and such denial raises an issue of general public importance."  42

U.S.C. § 3614(a).[3]

The Sixth Circuit has held that to demonstrate a "pattern or practice" of discrimination,

"the government must prove more than an isolated incident of unlawful discrimination. . . .

[U]nlawful discrimination, in other words, must have been a regular procedure followed by the

---

[3]  This evidence is also sufficient for a jury to find that Defendants denied rights to a "group of
persons," which is an independent basis for prevailing under Section 3614(a).  *See Parma*, 494 F.
Supp. at 1095.

defendant." *United States v. City of Parma, Ohio*, 494 F. Supp. 1049, 1095 (N.D. Ohio 1980), *aff'd*, 661 F.2d 562 (6th Cir. 1981).  As enumerated herein, a reasonable jury could find that Defendant Jones engaged in systemic harassment towards multiple female tenants that included sexual comments, requests for nude photos and sexual favors, and sexual touching that spanned more than a decade.  *See supra* Sec. I(B).  Defendant Jones' conduct towards each of the women was neither isolated nor unique.  *See id.*  For many of them, the harassment occurred when they were paying their rent—Defendant Jones would often make them get in his car, sometimes forcing them to power down their cell phones.  *See id.*  He also offered them the same types of gifts – cars, payments towards student loans, trips, and dinners – in exchange for sexual favors. *See id.*

Defendants' bare assertion that this evidence does not rise to a pattern of harassment is not sufficient to obtain summary judgment.  *See Balistrieri*, 981 F.2d at, 930 (7th Cir. 1992) ("The determination of whether evidence indicates a pattern or practice of discrimination is ordinarily a question of fact for the jury.").  The evidence shows that Defendants' conduct denied the eleven households identified in this brief of their rights under the FHA.  *See supra* Sec. I(B).  This many incidents is more than sufficient to establish that Defendants' conduct constituted a pattern or practice of unlawful actions. *See, e.g., United States v. Hurt*, 676 F.3d 649, 654 (8th Cir. 2012) (concluding that credible testimony of four victims was sufficient to establish that United States' allegations of a pattern or practice of sexual harassment were substantially justified); *United States v. W. Peachtree Tenth Corp.*, 437 F.2d 221, 227-28 (5th Cir. 1971) (relying substantially on two rejected rental applications, in addition to other evidence, to conclude that there was a pattern or practice of denying rentals to black applicants); *United States v. E. River Hous. Corp.*, 90 F. Supp. 3d 118, 155-159 (S.D.N.Y. 2015) (holding that

20

allegations that defendant failed to grant accommodations requested by three different persons with disabilities sufficiently alleged a pattern or practice of discrimination).  Indeed, the evidence shows that Defendant Jones' harassment was his "regular procedure" for managing the property as the evidence of harassment in this case dates back to 2008, only two years short of when Defendants began running their rental business.  *See supra*, Sec. I(A) and (B).  *City of Parma, Ohio*, 494 F. Supp. at 1095.

In addition, the evidence is also sufficient for a jury to find that Defendants denied rights to a "group of persons" – specifically the households of the eleven women that Defendants harassed and, in many cases, drove out of their homes – which is an independent basis for prevailing under Section 3614(a).  *See Parma*, 494 F. Supp. at 1095.

The United States' claims under Section 3614(a) for injunctive relief, monetary damages, and civil penalties are therefore all timely and valid.

### B.   A REASONABLE JURY COULD FIND DEFENDANT JONES SEXUALLY HARASSED EACH OF THE ELEVEN WOMEN, IN VIOLATION OF THE FAIR HOUSING ACT.

It is well established that sexual harassment is a form of discrimination on the basis of sex that violates the Fair Housing Act.[4]  *See, e.g,* 24 C.F.R. § 100.600; *Shellhammer v. Lewallen*,

---

[4]  The Supreme Court first recognized sexual harassment as a form of unlawful discrimination in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986), where it held that "[w]ithout question," when a supervisor sexually harassed an employee, that supervisor "'discriminates' on the basis of sex."  Although *Meritor* was a Title VII case, as noted in the text above, the Sixth Circuit and other Courts of Appeal have recognized sexual harassment as a form of liability prohibited by the FHA.  In addition, the Department of Housing and Urban Development (HUD) amended its regulations in 2016 to codify the standards for establishing such liability. *See* Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act, 81 Fed. Reg. 63,054 (Sept. 14, 2016).   Several district courts within the 6th Circuit have found that defendants were or could be held liable for sexual harassment under the FHA.  *See, e.g., United States v. Wygul*, No. 1:14-CV-2880-JDB-EGB, 2016 WL 4126583, at *1 (W.D. Tenn. Aug. 2, 2016); *United States v. Peterson*, 2011 WL 824602 at *2 (E.D. Mich. 2011); *Walker v. Crawford*, 1999 WL 33917846 at *6-7 (N.D. Ohio

21

770 F.2d 167, 1985 WL 13505 (6th Cir. 1985) (*per curiam*); *Krueger* v. *Cuomo*, 115 F.3d 487,

491 (7th Cir. 1997); *Quigley v. Winter*, 598 F.3d 938, 946 (8th Cir. 2010); *Hall* v. *Meadowood Ltd. P'ship*,

7 F. App'x 687, 689 (9th Cir. 2001); *Honce v. Vigil*, 1 F.3d 1085, 1089 (10th Cir. 1993).  There are

two theories of liability in FHA sexual harassment cases, *quid pro quo* and hostile environment.

24 C.F.R. § 100.600(a)(1)-(2); *Quigley*, 598 F.3d 946 (upholding a jury verdict for plaintiff on

sexual harassment claims under both hostile housing environment and *quid pro quo*).  *See also*

*Faragher v. City of Boca Raton*, 524 U.S. 775, 786-91 (1998) (describing hostile environment

and *quid pro quo* claims under Title VII).  Defendants' conduct is actionable under both legal

theories.[5]

> **1.**     **Defendant Jones' Unwelcome Sexual Advances and Touching Created a Hostile Housing Environment.**

Sexual harassment violates the FHA by creating a hostile environment when it is

"sufficiently severe or pervasive as to interfere with . . . [t]he availability, sale, rental, or use or

enjoyment of a dwelling" or "the terms, conditions, or privileges of the sale or rental of [a

dwelling].'"  24 C.F.R. § 100.600(a)(2); *see also Honce*, 1 F.3d at 1090 (holding that harassment

violates the FHA "when the offensive behavior unreasonably interferes with [the] use and

enjoyment of the premises" or is otherwise sufficiently severe or pervasive as to alter the

conditions of the housing); *Morris v. City of Colorado Springs*, 666 F.3d 654, 665 (10th Cir.

2012) (explaining that this element of hostile environment uses the disjunctive "or" such that the

---

1999).

[5]  The sexual harassment was carried out by Defendant Jones but, as Defendants do not dispute, he undertook those actions as an agent of Defendants Jones Investing LLC and Fatima. Therefore, Defendants Jones Investing LLC and Fatima are also liable under normal agency principles.  *See* 24 C.F.R. § 100.7(b) ("A person is vicariously liable for a discriminatory housing practice by the person's agent or employee, regardless of whether the person knew or should have known of the conduct that resulted in a discriminatory housing practice, consistent with agency law"); *Meyer v. Holley*, 537, U.S. 280, 282 (2003).

abusive conduct need not be both severe and pervasive).  One isolated incident may be sufficiently severe to constitute hostile housing environment harassment.  *See* 24 C.F.R. § 100.600(c) ("[a] single incident of harassment because of . . . sex may constitute a discriminatory housing practice, where the incident is sufficiently severe to create a hostile environment"); *Lockhard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072 (10th Cir. 1998) (holding that "a single incident of physically threatening conduct" can be sufficient to create an abusive environment and finding hostile work environment based largely on one incident where a customer grabbed plaintiff's hair and breast); *Beliveau v. Caras*, 873 F. Supp. 1393, 1398 (C.D. Cal. 1995) ("There are few clearer examples of classic sexual harassment than an unpermitted, allegedly intentional, sexual touching.  Under no circumstances should a woman have to risk further physical jeopardy simply to state a claim for relief under Title VIII.").  Conduct may be pervasive when it is "commonplace, ongoing, and continual[.]"  *Abeita v. Transamerica Mailings, Inc.*, 159 F.3d 246, 250-52 (6th Cir. 1998); *see also Black v. Zaring Homes, Inc.*, 104 F.3d 822, 825-26 (6th Cir. 1997).

In determining whether a housing environment is "hostile" or "abusive," courts look to the totality of the circumstances.  24 C.F.R. § 100.600(a)(2)(i); *see also Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993); *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 310 (6th Cir. 2016); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514-15 (6th Cir. 2009).  This analysis includes consideration of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the tenant's housing]."  *See* 24 C.F.R. § 100.600(a)(2)(i)(A) (setting out factors to be considered); *Harris*, 510 U.S. at 23; *see also Thornton v. Fed. Express Corp.*, No. 07-5116, 2008 WL 2492280, at *2 (6th Cir. Jun. 24, 2008) (same); *Williams v. General Motors Corp.*, 187

F.3d 553, 563 (6th Cir. 1999) (district court erred in finding sexual comments and "pranks" were merely offensive when it failed to consider context and accumulated effect). The analysis must also take into account "the social context," *Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998), in which the behavior occurs, since "[c]onduct which is considered normal and appropriate in one setting may be deemed abusive or hostile in another[,]" *EEOC v. Fairbrook Med. Clinic, PA*, 609 F.3d 320, 328 (4th Cir. 2010).[6]

Each of the eleven identified aggrieved persons testified that Defendant Jones subjected them to a combination of unwelcome sexual comments on their bodies, sexual advances, and sexual contact. *See supra* Sec. I(B). This sexual behavior was exacerbated by other disturbing patterns of conduct such as frequently driving by their homes, showing up unannounced, and calling them to discuss issues unrelated to their tenancies. *See id.* For instance, one former tenant, Ms. Williams, testified that when she paid her rent, Defendant Jones would instruct her to get into the passenger seat of his car, power off her cell phone, and show him that she complied. *See supra* Sec. I(B)(1). Before getting into his car, Defendant Jones would comment on Ms. Williams' body, saying things like, "Turn around. Let me see that ass." *Id.* Ms. Williams testified that Defendant Jones made unwelcome, sexual comments each time she paid her rent. *Id.* On top of that, Defendant Jones frequently drove by her house and told her to "pick up when [he] call[ed]." *See id.* The repetitive nature of the harassment – the fact that it happened each and every time Ms. Williams paid her rent – made Ms. Williams feel "tormented." *See id.*

---

[6] As many courts point out, sexual harassment in housing may be more difficult for victims than sexual harassment in the workplace. *See, e.g.*, *Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 113 (3d Cir. 2017) ("Harassment that intrudes upon the 'well-being, tranquility, and privacy of the home' is considered particularly invasive." (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)); *Quigley*, 598 F.3d at 947 (deeming the alleged sexual harassment "even more egregious" where the tenant was "subjected . . . [to] unwanted interactions in her own home, a place where [she] was entitled to feel safe and secure and need not flee").

Likewise, Ms. Coleman testified that "[e]very time" she paid her rent, Defendant Jones made sexually explicit comments, tried to hug her, looked at her breasts, asked her on dates, asked her on trips, asked why she was with her boyfriend, offered to move her to a nicer house, and at least one time touched her breasts without consent. *Supra* Sec. I(B)(2). This behavior was worsened by Defendant Jones' frequently calls and unannounced visits, sometimes late at night. *Id.* Ms. Coleman testified that Defendant Jones' behavior made her feel unsafe, but she needed a place to live. *Id.*

While the conduct experienced by the women may range somewhat in severity, the pervasiveness is consistent. Ms. Williams, Ms. Coleman, Ms. Crews, Ms. Haynes, Ms. Marble, Ms. Randle, Ms. Brown(2), and Ms. Henderson all emphasized that Defendant Jones made unwelcome, sexual comments nearly every single time they paid their rent. *See supra* Sec. I(B)(1)-(5), (7), (10), (11). Moreover, while Defendants may characterize Defendant Jones' comments about tenants' breasts and offers to have sex as merely "inappropriate" (Def. Br., ECF No. 76 at PageID.463), the jury could conclude otherwise, particularly given the context in which the comments were made or their frequency. *Oncale*, 523 U.S. at 81. At least six of the aggrieved persons testified that Defendant Jones' explicitly sexual behavior was exacerbated by him frequently driving by their homes, calling them, and showing up unannounced. *See supra* Sec. I(B)(1)-(6), (11). Again, it is the cumulative effect of the conduct and the context in which it occurred that creates a hostile environment, prohibiting the women from their right to live in their homes free from discrimination. *See Williams* at 187 F.3d at 563 ("[A] holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the . . . environment created thereby may exceed the sum of the individual episodes.").

Moreover, Defendants' brief ignores some of the most egregious conduct.  Significantly, Defendants fail to mention entirely that Defendant Jones also touched some of the women sexually without their consent.  (Def. Br., ECF No. 76 at PageID.441-465.)  Testimonial evidence shows that Defendant Jones touched tenants on their thigh (Ms. Williams and Ms. Shepherd), breasts (Ms. Coleman and Ms. Crews buttocks (Ms. Marble and Ms. Moore), and waist (Ms. Randle).  *See supra* Sec. I(B)(1)-(3), (6)-(8).  As stated above, even one instance of physical touching can be so severe that it gives rise to a hostile housing environment.  *Lockhard*, 162 F.3d at 1072.

The question of whether unwelcome conduct is sufficiently severe or pervasive ". . . is evaluated from the perspective of a reasonable person in the aggrieved person's position," *see* 24 C.F.R. § 100.600 (a)(2)(i)(C), and the conduct need not affect the victim's psychological well-being.  24 C.F.R. § 100.600 (a)(2)(i)(B) ("[n]either psychological nor physical harm must be demonstrated to prove that a hostile environment exists."); *Harris*, 510 U.S. at 22; *Jackson v. Quanex Corp.*, 191 F.3d 647, 666 (6th Cir. 1999) (failure to show hostile environment affected her psychological well-being was not fatal to plaintiff's claim).  As such, Defendants' argument that Defendant Jones' conduct was not severe or pervasive enough to interfere with the women's housing because some testified that they were not afraid of him, (Def. Br., ECF No. 76 at PageID.463), mistakenly incorporates an element to the claim that does not exist.  It is also inaccurate.  Some of the women testified that Defendant Jones' conduct made them feel so uncomfortable that they changed how they paid rent or took other measures to prevent him from stopping by their house.  *See supra* Sec. I(B)(1), (3), (4), (10).  The women described feeling "tormented" (Ms. Williams), "unsafe" (Ms. Coleman and Ms. Brown(2)), threatened he would evict them (Ms. Crews), and "fearful" (Ms. Haynes).  *See supra* Sec. I(B)(1)-(4).

26

Defendants' reliance on *Shellhammer v. Lewallen*, 770 F.2d 167 (6th Cir. Jul. 31, 1985), an unpublished disposition rendered in 1985, prior to both *Harris* and *Faragher*, is unpersuasive. The *Shellhammer* court applied the clearly erroneous standard to affirm the district court's finding that the two instances of offensive conduct by the landlord did not "create[] a burdensome situation which caused the tenancy to be significantly less desirable than it would have been had the harassment not occurred." *Id.* at *2. Even putting aside whether this isolated statement is a fair summary of the current hostile environment standard recognized by the Supreme Court and codified in HUD's regulation, the Sixth Circuit affirmed the district court's separate holding that the two instances constituted *quid pro quo* sexual harassment. *Id.* In any event, all but one of the women here ultimately found the harassment such an intolerable interference with their housing environment that they ultimately moved out voluntarily or chose not to contest Defendants' baseless attempts to evict them.[7] *See supra* Sec. I(B). The United States has demonstrated more than enough evidence to satisfy its evidentiary burden at this stage.

## 2.     Defendant Jones Conditioned Housing Benefits on Sexual Favors, and Evicted Tenants When They Rejected His Advances.

A landlord engages in *quid pro quo* harassment by trading or offering to trade housing benefits for sex. 24 C.F.R. §100.600((b)(1) ("Quid pro quo harassment refers to an unwelcome request or demand to engage in conduct where submission to the request or demand, either explicitly or implicitly, is made a condition related to" the rental or availability of the housing.) Put another way, "[q]uid pro quo harassment occurs when housing benefits are explicitly or implicitly conditioned on sexual favors." *Quigley*, 598 F.3d at 947; *see also Meritor Savings Bank*, 477 U.S. at 57; *Faragher*, 524 U.S. at 781; *Burlington Industries, Inc. v. Ellerth*, 524 U.S.

---

[7] The one tenant who has not yet moved out testified that she intends to once she is able to consistent with the limitations on her health. *See supra* Sec. I(B)(4).

742, 753-54 (1998); *Oncale*, 523 U.S. at 81.  A tenant suffers *quid pro quo* sexual harassment where she is subject to sexual advances and where her submission to those advances serves as an express or implied condition for receiving housing benefits.  *Quigley*, 598 F.3d at 947 (citing the *quid pro quo* standard from the Title VII context).  A single instance of *quid pro quo* harassment suffices to establish an FHA violation.  *See* 24 C.F.R. § 100.600(c) ("[a] single incident of harassment because of . . . sex may constitute a discriminatory housing practice, where the incident . . . evidences a *quid pro quo*.");  *Quigley*, 598 F.3d at 947-8 (upholding the jury's finding that *quid pro quo* harassment occurred based on one incident where a landlord's comment seemed to condition the return of the damage deposit upon seeing more of the tenant's body or receiving a sexual favor).

The evidence of *quid pro quo* harassment in this case is extensive.  As multiple women testified, Defendant Jones regularly asked female tenants to have sex or intimate relationships with him in exchange for housing-related benefits, such as reduced rent payments.  For example, Defendant Jones told Ms. Coleman that if she showed him her naked breasts, she would not have to pay for a home repair he was performing, *see supra* Sec. I(B)(2); offered to reduce Ms. Brown(1)'s rent if she would go out on a date with him, *see supra* Sec. I(B)(9); offered to reduce or waive Ms. Crews' rent in exchange for sex, *see supra* Sec. I(B)(3); repeatedly told Ms. Haynes that if she was his girl or went out with him she would not have to pay rent, *see supra* Sec. I(B)(4); told Ms. Marble that he would discount her rent if she had a sexual relationship with him, *see supra* Sec. I(B)(5); and told Ms. Randle that if she had a sexual relationship with him, things would be financially easier for her, *see supra* Sec. I(B)(7).  Defendant Jones' actions as detailed above constitute *quid pro quo* sexual harassment because he repeatedly offered female tenants tangible benefits, such as waiver of rent, reduced rent, gifts, or free repairs in

28

exchange for sex or intimate relationships.  *See* 24 C.F.R. §100.600(a)(1); *Quigley*, 598 F.3d at 947-8.

In addition, four of the women testified that Defendant Jones took adverse action by initiating meritless eviction proceedings against them, such as not renewing their lease, when they rejected his advances.  *See supra* Sec.(I)(B)(1), (2), (5), and (6).  These four instances constitute *quid pro quo* sexual harassment because Defendant Jones conditioned a specific housing benefit upon the tenant's acceptance of sexual conduct, and then took adverse action when they declined his advances.

Overall, the evidence is more than sufficient for a reasonable jury to find that Defendants engaged in unlawful *quid pro quo* harassment against a number of the tenants who testified.

## IV.    CONCLUSION

For all the foregoing reasons, the Court should deny Defendants' motion for summary judgment.

Respectfully submitted,

ANDREW B. BIRGE
United States Attorney
Western District of Michigan

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

SAMEENA SHINA MAJEED
Chief

 /s/ Laura A. Babinsky
LAURA A. BABINSKY
Assistant U.S. Attorney
United States Attorney's Office
Western District of Michigan
330 Ionia Avenue NW, Suite 501
Grand Rapids, MI  49503
Phone: (616) 456-2404
Fax: (616) 456-2510
Email: Laura.Babinsky@usdoj.gov

/s/ Amie S. Murphy
TIMOTHY J. MORAN
Deputy Chief
AMIE S. MURPHY
WILLISTINE T. HARRIS
Trial Attorneys
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW-4CON
Washington, D.C.  20530
Phone: (202) 353-1285
Phone: (202) 616-2677
Fax: (202) 514-1116
Email: Amie.Murphy2@usdoj.gov
Email: Willistine.Harris@usdoj.gov

*Attorneys for Plaintiff United States of America*

30